**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **TIFFENII MUMPHREY,** | § § § | |
| **Plaintiff,** | § § | |
| **-v-** | § § § | |
| **CHAPEL HILL INDEPENDENT SCHOOL DISTRICT, DR. DONNI COOK, LAMOND DEAN, BOARD OF TRUSTEES OF CHAPEL HILL INDEPENDENT SCHOOL DISTRICT** | § § § § § § § | **Civil No.** **6:17-cv-00710** |
| **Defendants.** | § | |

## PLAINTIFF TIFFENII MUMPHREY'S ORIGINAL COMPLAINT AND JURY DEMAND

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

Plaintiff Tiffenii Mumphrey files this Original Complaint because Chapel Hill Independent School District discriminated against her on the basis of her race. Chapel Hill has a history and pattern of discriminating against African-Americans within the district. Unfortunately, Mrs. Mumphrey became one of the latest victims of Chapel Hill's system of discrimination. Contrary to Chapel Hill's claim, Mrs. Mumphrey always performed her job as expected. In fact, Mrs. Mumphrey had a dual contract with Chapel Hill and was terminated because of false allegations related to coaching duties, which had nothing to do with her excellence as a classroom teacher. Yet, Chapel Hill took action to terminate her employment. The real reason for Mrs. Mumphrey's termination was Chapel Hill's discriminatory practices as they relate to race.

# I.
## PARTIES

1.     Tiffenii Mumphrey is an individual who resides in Smith County, Texas.

2.     Defendant Chapel Hill Independent School District is a Texas school district located in Smith County, Texas.  Defendant Chapel Hill I.S.D. may be served with process by serving Superintendent Dr. Donni Cook or Interim Superintendent Lamond Dean at 11134 County Road 2249, Tyler, TX 75707-5304.

3.     Defendant Dr. Donni Cook, was Superintendent of Schools for Chapel Hill Independent School District.  Defendant Dr. Cook may be served with process at 11134 County Road 2249, Tyler, Texas 75707-5304 or wherever she may be found.

4.     Defendant Lamond Dean, is Interim Superintendent of Schools for Chapel Hill Independent School District.  Defendant Mr. Dean may be served with process at 11134 County Road 2249, Tyler, Texas 75707-5304 or wherever he may be found.

5.     Defendant Board of Trustees of Chapel Hill Independent School District may be served by serving Board President Glen Elliott with process at 11134 County Road 2249, Tyler, Texas 75707-5304 or wherever he may be found.

# II.
## JURISDICTION AND VENUE

6.     This Court has jurisdiction to hear the merits of Plaintiff's claims under 28 U.S.C. §§ 1331 and 1343(a)(4) because Plaintiff asserts claims under 42 U.S.C. § 1981 brought through 42 U.S.C. § 1983 and 42 U.S.C. § 2000e-5(f)(3).  The Court has supplemental jurisdiction over Plaintiff's claims under the Texas Labor Code and Texas Law because those claims are so related to the claims in the action with the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  28 U.S.C. § 1367.

7.     Venue is appropriate in the Eastern District of Texas because the acts giving rise to this suit occurred in Smith County, Texas.

## III.
## FACTS

8.     Mrs. Mumphrey first began working for Chapel Hill in 2015.  About a month after signing her original contract, Mrs. Mumphrey was called in to human resources to sign a new contract, which was a dual contract as an English IV Teacher and coach.

9.     Prior to accepting employment with Chapel Hill Mrs. Mumphrey had an impressive resume and was highly recommended for the position with Chapel Hill.

10.     Unfortunately, Chapel Hill does not treat African-American employees the same as similarly situated Caucasian employees.

11.     A close examination of Chapel Hill's hiring, retention, firing, and promotional practices as they relate to African-Americans clearly demonstrates that the actions taken by Chapel Hill against Mrs. Mumphrey were not unique to her, but a part of Chapel Hill's racially discriminatory culture.

12.     Chapel Hill subjected Mrs. Mumphrey to disparate treatment and allowed Mrs. Mumphrey to suffer under a hostile work environment by failing to take action when colleagues and students were allowed to bully her because of her race.

13.     When beginning her employment with Chapel Hill in 2015, Mrs. Mumphrey was to receive a $6,500.00 stipend as a coach.

14.     However, Chapel Hill inexplicably reduced her stipend to $5,700.00 without giving her notice.

15.     Chapel Hill alleged that the stipend was reduced due to her not having coaching responsibilities during the Christmas holiday.

16. Yet, Mrs. Mumphrey was at every basketball practice, game, and tournament during the Christmas break.

17. Similarly situated Caucasian coaches, who in fact had no responsibilities during the Christmas break, did not receive reductions in their stipends.

18. By way of example, Coach Erin Andrews, who is Caucasian, received an *increase* in her stipend.

19. Yet, Coach E. Andrews was not even in the state during the Christmas Break. Clearly, Coach E. Andrews was not participating in any coaching responsibilities.

20. This is just one of the ways in which Chapel Hill discriminated against Mrs. Mumphrey. As her employment went on, the discriminatory actions continued.

21. In terminating Mrs. Mumphrey's employment, Chapel Hill made false accusations alleging that she failed to follow her supervisor's instructions, was combative towards another coach, and arrived late to practices and left early.

22. Mrs. Mumphrey was diligent in following the instructions of her supervisors and was never combative toward them.

23. With regards to arriving late to practices, it should be noted that Mrs. Mumphrey had a disabled student in her first period class.

24. Therefore, she was required to wait for the student to gather their belongings before leaving her classroom and changing for practice.

25. Additionally, Chapel Hill failed to support Mrs. Mumphrey in addressing disciplinary matters with students under her instruction.

26. This failure on the part of Chapel Hill was done to undermine Mrs. Mumphrey's authority, which resulted in an environment where Mrs. Mumphrey was not only forced to

endure discrimination based on her race from Chapel Hill's administration, but also required her to work in an environment where students were allowed to disrespect her. This further complicated Mrs. Mumphrey's employment with Chapel Hill, as the students' disregard for her authority and position went unchecked by the district.

27. By way of example, on or about January 9, 2016 a student posted a disrespectful and derogatory picture of Mrs. Mumphrey on Snapchat with a caption that read, "the look on your face when you realize that your Bae's status is changed from in a relationship to single."

28. Mrs. Mumphrey reported this student to Chapel Hill. Chapel Hill refused to take action. Instead, Chapel Hill allowed this student to demean and disrespect Mrs. Mumphrey without recourse.

29. When Mrs. Mumphrey instructed the student to delete the photo, the student continued to disrespect Mrs. Mumphrey by ignoring Mrs. Mumphrey's instructions and texting on her phone.

30. Instead of handling the matter appropriately, Chapel Hill made accusations against Mrs. Mumphrey, alleging that Mrs. Mumphrey mishandled the situation.

31. For instance, Chapel Hill alleged that Mrs. Mumphrey abandoned her responsibilities on the early evening of January 9, following the photo incident with the student, by failing to return to the school with the students on the bus. However, before leaving that evening with her husband, Mrs. Mumphrey was given explicit permission to do so by Coach Jeremy Durham, a white male.

32. Due to Chapel Hill's failure to reprimand the student for the January 9 incident, other students mimicked this behavior.

33. On or about January 11, 2016, Mrs. Mumphrey attempted to correct a student's behavior in the weight room. The student had stated to another student, "I wish [Mrs. Mumphrey] would say something to me because I am going to go off and no one will be able to calm me down." When Mrs. Mumphrey questioned the student about the statement, she proceeded to speak to Mrs. Mumphrey in a loud and disrespectful tone stating that she was tired of Mrs. Mumphrey and called her messy.

34. Mrs. Mumphrey then took the student to Coach Durham to address the issue and the students' behavior. The student continued to speak to Mrs. Mumphrey in this tone in front of Coach Durham, other students, and other adults.

35. When the party moved the matter into Coach Durham's office, instead of reprimanding the student or even instructing the student that she should not speak to Mrs. Mumphrey in such a manner, Coach Durham questioned the student, asking what Mrs. Mumphrey had done to upset the student. When Mrs. Mumphrey attempted to speak to Coach Durham about the matter, Coach Durham refused to let her speak and simply sent the student home.

36. Coach Durham clearly sent a message to the students that that type of behavior toward Mrs. Mumphrey was acceptable and would go unpunished, just as the photo incident had gone unpunished.

37. Chapel Hill subsequently, and falsely, alleged that Mrs. Mumphrey was the source of this dispute with the student, alleging that she was initiating conversations with students about the January 9 incident.

38. However, that was not case, Mrs. Mumphrey was approached by a student who asked her why Coach Linda Godwin was speaking to the team about their social media accounts.

Mrs. Mumphrey simply instructed the student that if she was involved in any negativity on social media she should cease activity. This is when the other student interjected and began speaking to Mrs. Mumphrey in a disrespectful manner resulting in the need to take the matter to Coach Durham who failed to take appropriate action.

39. In addition to the false accusations made against Mrs. Mumphrey, Coach Durham failed to treat Mrs. Mumphrey the same as Caucasian coaches.

40. This disparate treatment included failing to provide Mrs. Mumphrey with things such as the same coaching attire.

41. Coach Durham even went so far as to fail to cover a meal for Mrs. Mumphrey on a team trip with the school on January 9, 2016, though he would pay for his then sixth-grade daughter's meals with the school credit card when she would ride back on the bus with the teams from games.

42. Mrs. Mumphrey began to endure these problems early in the school year.

43. As one maneuver to demoralize Mrs. Mumphrey, her entire family volunteered to work a marathon, which was being held as a fundraiser for the basketball team in or around October 2015. Mrs. Mumphrey was told a time to be at the event, which was later than what everyone else was told. When Mrs. Mumphrey arrived, it looked as though she was late to the event.

44. In addition, everyone that worked the marathon were told by Coach Durham that they would receive t-shirts. Everyone got their shirts, but Mrs. Mumphrey and her family were never given their shirts, even after repeated requests.

45. Additionally, coaches would go so far as to change the workout plans and provide handouts to the student athletes, but would fail to provide Mrs. Mumphrey with these changes.

46. Furthermore, Coach Kolby Andrews, a white male, went to the track where Mrs. Mumphrey was working with the girls and took over the entire practice. Everything Mrs. Mumphrey instructed the girls to do, he would go behind her and tell them to do things his way. Coach K. Andrews never interacted with Mrs. Mumphrey, he simply talked over her and undermined her at every opportunity.

47. Mrs. Mumphrey's requests to be included were completely ignored.

48. Furthermore, Mrs. Mumphrey was never given the opportunity to perform her duties as a freshman basketball coach, as she was never allowed to coach a game, nor was she ever mentored, even after repeated requests.

49. Mrs. Mumphrey, though hired as a coach, had her responsibilities relegated to updating Coach Durham's personal and team Shutterfly accounts, taking the athletes orders and ordering meals during away games, and watching over the girls in the weight-room during after school practices.

50. Clearly, these maneuvers by Chapel Hill were intended to demoralize and demean Mrs. Mumphrey. They were designed to make her appear unqualified and ill prepared for practice.

51. Prior to Chapel Hill's termination of Mrs. Mumphrey's employment, Chapel Hill had sent a clear message to the faculty and students, following the January 9, 2016 incident, by reassigning Mrs. Mumphrey. The message: "it is okay for faculty and students to disrespect and bully Mrs. Mumphrey, there will be no repercussions."

52. The Athletic Director, Coach Thomas Sitton told Mrs. Mumphrey that she was to report and stay in her classroom during 2nd and 8th periods as a result of her reassignment.

53. Ultimately, Chapel Hill terminated Mrs. Mumphrey's employment following various false accusations.

54. On or about April 14, 2016, Girl's Athletic Director Linda Goodwin, Athletic Director Thomas Sitton, and High School Principal Jeff Hogg sent correspondence to Dr. Cook recommending the termination of Mrs. Mumphrey's contract.

55. Dr. Cook facilitated the termination of Ms. Mumphrey's employment.

56. On April 19, 2016, correspondence was addressed from Dr. Cook notifying Ms. Mumphrey that a majority of the of the Board of Trustees of Chapel Hill Independent School District voted to terminated her employment.

57. Though there were no allegations against Mrs. Mumphrey related to her classroom performance, she was told that coaching job was tied to her position as an English teacher.

58. This was Chapel Hill's argument for not retaining Mrs. Mumphrey as a classroom teacher.

59. However, Mrs. Mumphrey's basketball successor was not an English teacher, but instead a white math teacher.

60. Accordingly, Mrs. Mumphrey's coaching duties could have been reassigned while allowing Mrs. Mumphrey to remain in the classroom.

61. But clearly, Chapel Hill was determined to terminate Mrs. Mumphrey's employment.

62. Chapel Hill discriminated against Mrs. Mumphrey because of her race, African-American, and retaliated against her when she made complaints regarding the disparate treatment.

63. Chapel Hill's actions against Mrs. Mumphrey are consistent with their overall treatment of African-American within the district.

64. Chapel Hill has only a handful of African-American teachers they hire.

65. There are numerous examples of Chapel Hill's discriminatory hiring practices.

66. Chapel Hill recently hired Jason Hooker, Caucasian, as athletic director and head football coach.

67. Coach Hooker's record at Brownsboro High School for the 2016-2017 football season was 2-8.

68. Chapel Hill did not interview, or even consider, at least three known African-American applicants with more successful coaching records.

69. Chapel Hill hired football coach Donald Hubbard, Caucasian, and demoted an African-American coach, removing him from the football coaching staff. Coach D. Hubbard is the father to Coach Seth Hubbard.

70. As a result of Chapel Hill's actions, the African-American coach resigned.

71. Chapel Hill's treatment of Mrs. Mumphrey is an example of Chapel Hill's treatment of African-American teachers in the district as a whole.

72. Of the few African-Americans hired, Chapel Hill is rarely able to retain them with the system of discrimination created by the district in which African-American employees are regularly terminated, not provided equal opportunities of advancement, and/or passed over for positions where less qualified Caucasian employees are promoted or hired in upper level positions.

73. African-American's employed within Chapel Hill will never have the same opportunities as Caucasian employees.

74. In particular, within the Chapel Hill system, there are African-American teaching aides with the proper certifications to be teachers, but Chapel Hill fails to give them the opportunity.

75. There is an African-American teacher's aide that has been with the district nearly 20 years. This aide has a bachelor's degree and wanted to go back to school to get a teaching certificate to teach within Chapel Hill. However, the aide was told by Dr. Cook that she would not recognize the aide's degree obtained from an HBCU ("Historically Black Colleges & Universities").

76. There is another African American aide that is working within Chapel Hill as a Special Education Aide, who has special education certification. However, when a full-time special education teaching position became available this aide was overlooked for the position as Chapel Hill went outside the district to hire a Caucasian.

77. Mrs. Mumphrey filed a charge of discrimination with the U.S Equal Employment Opportunity Comission, which was dual filed with the Texas Workforce Commission – Civil Rights Division, on or about September 16, 2016. Mrs. Mumphrey was issued her notice of right to sue on October 4, 2017.

78. All conditions precedent to the bringing of this suit have been satisfied or have been fulfilled, as Plaintiff exhausted the necessary administrative remedies.

### IV.
### TITLE VII RACE DISCRIMINATION BY DEFENDANTS

79. Defendants' actions in discriminating against Mrs. Mumphrey, its failure to investigate and take remedial action following Mrs. Mumphrey's complaints of discrimination, and termination of Mrs. Mumphrey's employment, were undertaken because of her race.

80. Defendants' actions constitute violations of the Title VII of the Civil Rights Act of 1964.

81. Due to Defendants' actions, Mrs. Mumphrey has suffered, and continues to suffer, damages including but not limited to lost wages, both past and future, the value of fringe benefits, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

82. Defendants' actions were intentional, malicious, and committed with reckless indifference to Mrs. Mumphrey's federally protected rights.

## V.
## SECTION 1981 RACE DISCRIMINATION THROUGH SECTION 1983 BY DEFENDANTS

83. Defendants' actions in discriminating against Mrs. Mumphrey, its failure to investigate and take remedial action following Mrs. Mumphrey's complaints of discrimination, and termination of Mrs. Mumphrey's employment, were undertaken because of her race.

84. Defendants' actions constitute a continuing violation of 42 U.S.C. § 1983.

85. The allegations above show that Defendants have a persistent, widespread practice of discrimination, which is so common and well settled as to constitute a custom that fairly represents the district's policy regarding Defendants' hiring, firing, retention, and promotional practices related to African-American employees.

86. Defendants have actual or constructive knowledge of such custom.

87. Due to Defendants' actions, Mrs. Mumphrey has suffered, and continues to suffer, damages including but not limited to lost wages, both past and future, the value of fringe benefits, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

88. Defendants' actions were intentional, malicious, and committed with reckless indifference to Plaintiff's federal-protected rights, entitling Plaintiff to compensatory and punitive damages under Section 1983.

89. Defendants' actions were done with malice or reckless indifference to the legally protected rights of Mrs. Mumphrey.

## VI.
## TCHRA RACE DISCRIMINATION BY DEFENDANTS

90. Defendants' actions in discriminating against Mrs. Mumphrey, its failure to investigate and take remedial action following Mrs. Mumphrey's complaints of discrimination, and termination of Mrs. Mumphrey's employment, were undertaken because of her race.

91. Defendants' actions constituted a continuing violation of the Texas Commission on Human Rights Act, Tex. Lab. Code § 21.001, *et seq*.

92. Due to Defendants' actions, Mrs. Mumphrey has suffered, and continues to suffer, damages including but not limited to lost wages, both past and future, the value of fringe benefits, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

93. Defendants' actions were intentional, malicious, and committed with reckless indifference to Plaintiff's state-protected rights, entitling Plaintiff to compensatory and punitive damages under the Texas Labor Code, Chapter 21.

94. Defendants' actions were done with malice or reckless indifference to the legally protected rights of Mrs. Mumphrey.

## VII.
## TITLE VII, SECTION 1981, AND TCHRA RETALIATION BY DEFENDANTS

95. Defendants violated Title VII, Section 1983, and Texas Labor Code when it began to make false allegations regarding Mrs. Mumphrey's work performance, reassigned her

coaching duties, and took disciplinary actions against Mrs. Mumphrey leading up to her termination because of her complaints of and opposition to race discrimination.

96.     Mrs. Mumphrey participated in protected activity when she made complaints about discrimination.

97.     Due to Defendants' actions, Mrs. Mumphrey has suffered, and continues to suffer, damages including but not limited to lost wages, both past and future, the value of fringe benefits, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

98.     Defendants' actions were intentional, malicious, and committed with reckless indifference to Plaintiff's federal and state-protected rights, entitling Plaintiff to compensatory and punitive damages.

99.     Defendants' actions were done with malice or reckless indifference to the legally protected rights of Mrs. Mumphrey.

## VIII.
## DAMAGES

100.     WHEREFORE, Plaintiff Tiffenii Mumphrey respectfully requests that the above-named Defendants, be cited to appear in this matter and that, after jury trial by proof, she be awarded:

    i.    Back pay, including but not limited to, lost wages, and other employment benefits;

    ii.    Front pay, including but not limited to wages, and other employment benefits;

    iii.    Judgment against Defendants for compensatory damages including emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life;

    iv.    Actual damages;

    v.    Punitive damages;

vi.    Injunctive or prospective relief;

vii.    Removal of Chapel Hill's Notice of Nonrenewal and any similar documentation from Plaintiff's official personnel file or records;

viii.    Removal of false allegations regarding performance from Plaintiff's official personnel file or records;

ix.    Anti-discrimination policy implementation and practice throughout Defendants' school district;

x.    Judgment against Defendants for Plaintiff's reasonable attorneys' and experts' fees; and costs of suit;

xi.    Prejudgment and post-judgment interest as allowed by law; and

xii.    Such other and further legal and/or equitable relief to which Plaintiff may be justly entitled, as this court may deem proper.

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays that Summons be issued, and that upon a trial on the merits Plaintiff be awarded the relief requested in this Complaint and such other and further relief to which he may be justly entitled.

Respectfully submitted,

Kalandra N. Wheeler (Attorney-in-Charge)
Texas Bar No. 24051512
Robert J. Wiley*
Texas Bar No. 24013750
*Board Certified in Labor and Employment Law
by the Texas Board of Legal Specialization

ROB WILEY, P.C.
1651 Richmond Avenue
Houston, Texas 77006
Telephone: (713) 337-1333
Facsimile: (713) 337-1334
kwheeler@robwiley.com
ATTORNEYS FOR PLAINTIFF